SAGE, &c.
vs.
DILLARD, &c.

---

CHANCERY.

Case 39.

## Sage, &c. vs. Dillard, &c.

ERROR TO KENTON CIRCUIT.

1. An act of the Legislature incorporated the Western Baptist Theological Institute, in 1840, with seven trustees, by name, reserving the power to amend the charter. In 1841, an act was passed authorizing the trustees to increase their number to thirteen, which amendment was accepted. In 1845 another amendment to the charter was passed, authorizing the trustees to increase their number to thirty-six, which was also accepted. In 1848 a third amendment was passed appointing sixteen additional trustees to the number then in office (which was twenty-one,) which amendment a majority of the seventeen then in office met and refused to accept, or permit the sixteen to act with them as trustees, and adjourned.

A minority of the seventeen, and the sixteen appointed by the act of 1848, organized themselves into a board, and claimed the control of the Institute. Held—that the Legislature had no power to add to the number of the trustees without their consent, and that the newly appointed trustees and a minority of those in office had no right to assume the control of the institution.

2. A reservation by the Legislature in a charter to alter, repeal, or amend, does not imply the power to alter or change the vested rights acquired by the corporators under the charter, and to add new parties and managers without the consent of the corporators.

The facts of the case are stated in the opinion of the court.—*Rep.*

*Benton & Kinkead*, for appellants—

This bill was filed in 1848, by R. T. Dillard and seventeen others, styling themselves trustees of the Western Baptist Theological Institute, against Sage and thirteen others, trustees of said Institute.

The Institute was chartered in the year 1840, by the Legislature of Kentucky, by which Cave Johnson and six others were declared a body politic and corporate, by the above name, and by that name authorized to sue, be sued, &c. The corporation was authorized to establish a school in or near Covington, for the promotion of education in the Baptist denomination, and to acquire and hold, but not to appropriate the funds to any other purpose.

By the 4th section of the charter the trustees are authorized to fill vacancies in the board of trustees.

By the 6th section they were authorized to make all such by-laws, rules, &c., as might be necessary, and alter the same at pleasure, provided they were not repugnant to the laws of the commonwealth nor inconsistent with the charter.

In the 11th section it is provided that the Legislature may alter, amend, or repeal the act whenever it may deem it right and proper to do so.

In 1841, at the instance of the corporation, the Legislature did amend the charter, by passing an act authorizing the increase of the number of the trustees to thirteen, whenever the board should deem it

SAGE, &c.
vs.
DILLARD, &c.

expedient; to hold annual meetings at such time and place as they should select, and five trustees to form a quorum.

In 1845 another act was passed for amending the charter, increasing the number of trustees to thirty-six whenever it might be deemed prudent to do so, which was likewise passed at the instance of the board of trustees.

A third amendment was passed in January, 1848, without the knowledge of the board of trustees, appointing sixteen additional trustees to the number then in office. The 2nd section provided that none but citizens of Kentucky should be appointed trustees in said Institute; and that the appointment should be made at a regular meeting when a majority of all the trustees should be present, and a majority of all the trustees concur in said appointment; also in the 3rd section, that no sale should be made of any estate except by the order of the whole, at a regular meeting.

There were twenty-one trustees in office when the act was passed, and at the regular meeting in March, 1848, the last amendment was presented to the board for acceptance, and upon vote being taken, it was rejected by a vote of ten to two. The persons named in the last amended act presented themselves, or a part of them, and desired seats, which was objected to, and they were refused seats at the board as trustees and not recognized as trustees, and the board adjourned by a vote of ten to four. After the adjournment those persons, or a part of them, and a few trustees, undertook to organize a board, and appointed a chairman *pro tem.* and proceeded to abolish the office of general agent, which the plaintiff, Sage, had filled, and filed their bill against him to require him to give up all books and papers in his hands. Sage denies their right to the papers; questions their appointment; denies he has the papers, and gives a history of the foundation, progress, and management of the Institute.

SAGE, &c.
· vs.
· DILLARD, &c.

The questions involved in this case may be reduced to the following:

1'. Is the suit correctly brought, and by the proper parties?

2. Was the act of the 28th of January, 1848, appointing sixteen new trustees, constitutional?

3. Was it error in the court below to decree that Sage surrender the books and papers to these trustees, when it was shown that the chairman of the board had them? Was it or not error to decree that they should be delivered to the trustees?

1. We think the suit was not correctly brought. Equity has not jurisdiction. The remedy to recover the books and papers, from an officer who has been removed, is complete at law. If equity has jurisdiction, then most certainly the suit should have been brought in the name of the corporation. It is for property of the corporation. Corporate rights only are to be affected; and redress must be sought in the corporate name alone. What right of one of the newly appointed trustees was affected, who never gave one cent to the Institute; had neither knowledge or interest in founding the Institute; possibly never was in it before being appointed trustee. Has he any personal rights? If not, how can he sue? Why should not the corporate name be used? It is in vain to contend that the suit is virtually in the name of the corporation, because the complainants style themselves trustees of the corporation. They seek in their own names to recover property belonging to the corporation.

2. We contend that the act of 28th January, 1848, so far as it appoints sixteen trustees, and so far as it limits future appointments to citizens of Kentucky, is unconstitutional.

Charters are contracts. The provision in the constitution which inhibits any law to be made impairing the obligation of contracts, is violated by the Legislature when it passes any law affecting rights acquired under a charter. We speak of private cor-

porations. This is one of an eleemosynary charter. The authorities are so full and clear that it is a private corporation, and not a public one, that we forbear to argue the point, and barely observe that while the Legislature may amend the charters of public corporations, it cannot amend those of private corporations. The charter under consideration forms an exception, because of the reservation contained in it, and therefore may be amended. It may be said that although this is a private corporation, it is intended for public use. While the benefits are intended and desired to be as exclusive as possible, yet cannot be said to be for the public benefit. A careful examination of the provisions of the charter best answer this argument. It is to promote education in the Baptist denomination in the West.

No charter can be amended without the consent of the corporation. This principle is not only true when applied to charters, which do not contain any provision authorizing amendments, but also to those having such provisions. The former are expressly prohibited, and in the latter an acceptance of the amendment indispensable to give it effect. Though the Legislature may pass the act, it does not constitute part of the charter until it is accepted. It may, however, operate as a repeal. If it be such an amendment as might be constitutionally passed, the corporation would be forced to accept it or surrender their chartered privileges: which, we insist, would be the ultimatum of such a contest.

It cannot be that the reservation by the Legislature of the right to amend a charter, would allow all character of changes to be made. The alterations must be consistent with the original object of the corporation, furthering the interest of the founders, improving and advancing that object, affording aid and protection thereto, and not interfering with the appointment of its managers or officers, nor affecting the control by transferring it into other hands, and other changes of like character. The amendment of

SAGE, &c.
vs.
DILLARD, &c.

a charter by increasing the number of trustees, is of a very different character, from that of exercising the right and privilege by election. The granting a right and changing by enlarging or restraining that right, and the exercise of that right is wholly distinct. The Legislature may grant a right, but cannot exercise the privileges granted. These rights belong to the grantees. If the Legislature could elect sixteen trustees for the Institute without its consent, it might elect fifty or an hundred, and take entire possession and control, and thus provide for favorites, or they might remove the trustees appointed by the corporators, and give it into the hands of strangers, Roman Catholics, or Mormons, or change it into a military school, or a manufacturing company, and thereby defeat the object of the founder. A doctrine fraught with such consequences is not to be tolerated.

That part of the amendment limiting the power of the corporation to the State of Kentucky, in the appointment of its trustees, is equally unconstitutional, as it is a restriction upon the power conferred by the original charter. The object of the founders was to promote the education of Baptists in the western States. Ohio, Indiana, Illinois, Missouri, &c., were all intended to partake of the benefits, and should be allowed a representation in the board. If Kentucky alone had founded the institution, its location would most probably have been different. The original design was to locate in Ohio, but that purpose was changed.

3. The Circuit Court decreed that Sage deliver over the books, papers, &c., to the trustees of the institute. The order does not inform him who are the trustees—whether the new or the old. We suppose the complainants were intended.

What authority have the complainants to the control of the papers, or to the possession of them? Do they not regularly belong to the custody of the officers whose duty it is to take charge of them? They belong to, and are the property of the institute, and

Sage, &c.
. vs.
. Dillard, &c.
when the corporation desire them to be placed in the hands of their officers, they have only so to order, and it has to be done. If it is not done, they may proceed at law to recover the possession, and damages for their detention.

The reservation of the right to amend, applied to the original act of incorporation. In the amendments accepted, there is no such reservation of right. Yet the act of 1848 purports to be an amendment of the amendments, which is going beyond the reservation of the power to amend.

The position assumed by the counsel for the defendants in error, that the Legislature having appointed the trustees originally, and then allowed an increase of that number, which was at the request of the corporation, gave the implied power again to increase by an act of the Legislature, is not a just and authorized conclusion. The increase in the first instance was at the instance of the corporation. The second was not. There was no assent given. The charter was a contract; it could be changed but by consent of both parties to it.

We deny that the Legislature had any power under the reservation in the original charter, to do any act of legislation in regard to the institution, calculated to defeat the object of the founders, in any way to impair any right vested under the charter, and no right to pass the act of January, 1848, the effect of which will be to take the control of the institution from its founders, and place it in the hands of strangers.

1. In regard to the power of the Legislature to amend a charter, see 1 *Sumner*, 297–8, 302.

2. As to who may sue, and in what name, see 4 *Howard*, 359; 7 *Mass. Rep.* 444; *Angel & Ames on Corp.* 116.

3. The constitutionality of the act of the 28th of January, 1848. The Legislature cannot, by amendment or new charter, transfer the rights of a corporation to a new body. (1 *Paige*, 102; 4 *Wheat.* 708

*to* 712 ; 2 *Mass. Rep.* 146 ; 11 *Ohio*, 116 ; 7 *Cowen*, 402 ; 12 *Wend.* 225 ; *Skin.* 537 ; 2 *Barnes*, 391 ; *Wilcock on Mun. Corp*, 202 ; *Angel & Ames on Corp.* 70 ; 1 *Sumner, Allen vs. Keene*; 7 *Sargeant & Rawle.*) Charter must be accepted.

That a corporation may dissolve, does not admit of a doubt. (19 *John*, 474.) All judges who have touched upon this point so decide. (2 *Kyd on Corp.* 467 ; *Angel and Ames*, 656 ; 7 *Mass. Rep.* 485 ; 16 *Ib.* 86 ; 1 *Paige*, 107 ; 9 *Ohio*, 203 ; 8 *Pet.* 281 ; 2 *Kent*, 250–1.)

*Morehead & Brown*, on the same side—

1. The Legislature had no power, under the reservation of the original grant, to appoint the sixteen additional trustees, and to name them in the act. We contend that they, with a minority of the old trustees, had no right, after the board refused to accept the act to organize themselves into a board, and act as an independent and separate corporate body. The regular board of trustees had adjourned. There was no mode pointed out by law for having a called board, except through the chairman of the board itself in the adjourning order. In *Angel & Ames on Corp.* 241, it is said : "A. corporate assembly being apprehensive of a riot from the violence of the different parties, was dissolved, and some of the members remained, saying that the assembly was not dissolved, and thereupon made divers orders, and caused them to be entered on the books. This cause was held to be sufficient for disfranchising those who remained and concurred in such acts." The case of the *Protector vs. Kingston, Story*, 478, 48, is referred to for this position.

The board having adjourned without any appointment for another meeting, five trustees nor any other number had any right to meet, appoint a president, *pro tem.*, and transact business. If such could be the case, there might have been several such boards, each claiming control of the institution. If the six-

Sage, &c.
vs.
Dillard, &c.

teen newly appointed trustees were in fact legally appointed, they had no right to act as they did act, and, in violation of the by-laws, organize a board. If the board refused to permit them to act, their remedy was by *mandamus*, where the question of their right could have been judicially determined, which would avoid all conflict of authority. (*Angel & Ames on Corp.* 242, 431, 426.)

2. If the Legislature had the right to make the amendment, the corporation refused to accept it, and we hold that without an acceptance, it was not obligatory. The effect of a refusal to accept, whether or not, is equivalent to a surrender of their corporate franchises, is not now a question. They did refuse, and we contend they were not bound by the amendment. (See *Rex vs. Emery*, 1 *T. Rep.* 575 ; *King vs. Passmore*, 37 *R.* 240 ; *King vs. Askrew*, 4 *Burr.* 2, 200 ; *Ellis vs. Marshall*, 2 *Mass. R.* 279 ; *Angel & Ames on Corp.* 47.)

If such was not the law, the grossest injustice might be perpetrated under the reserved power to alter or amend. Our country is literally filled with private corporations for banks, manufactories, and almost every conceivable object. If an individual vests $1,000 in a corporation for manufacturing, being willing to risk that much and no more, and the Legislature, under a reserved power to amend, should pass a law to make all stockholders individually liable for all the debts of the corporation, would not the corporation have a right to refuse such an amendment, and surrender their franchises ? If, under the reserved power, the Legislature were to appoint directors in a bank sufficient to control its affairs, and the stockholders should be of opinion that they would ruin the bank, could they not refuse to accept the amendment, and thus surrender their franchises. A thousand cases could be imagined where gross injustice would ensue without the recognition of this principles.

SAGE, &c.
vs.
DILLARD, &c.

3. But the main question in the case, upon which both sides are anxious to have the opinion of the court, is whether the Legislature, under the reserved power to repeal, alter, or amend the charter, have the power to appoint additional trustees? This is conceded to be a private corporation. The charter is a contract between the State and the members composing the corporation. In consideration of some supposed incidental benefit to the public, certain franchises are granted. Among the franchises granted is that of filling all vacancies which may occur in the board. We contend that there is an obvious distinction between the power reserved to alter, amend, or repeal the charter, and the right of the Legislature to exercise any of the separate franchises. If it could exercise one it could all, and control and take away, or transfer to others, all the property belonging to the corporation. The question is, has the Legislature granted to the trustees the right of electing their own associates. If so, it may qualify the mode of exercising this right, and perhaps take it away entirely; but leaving the power still subsisting in the trustees, it has no right to usurp the exercise of the franchise which has been granted to the trustees. In the case of the *University of Maryland vs. Williams*, 9 *Gill & Johnson*, 409, the court said: "The franchises of a corporation are private property, regarded as such by the law, and under the safeguard of the same principle that protects and preserves from legislative violation, the property and rights of individuals in their natural character." The Legislature has reserved the right of modifying the mode and manner of enjoying the property; but while the right exists, it cannot be enjoyed by the grantors. The act appointing the sixteen new trustees was neither an alteration or amendment of the charter. The provisions of the charter with regard to the election of trustees, was left untouched. The trustees still have the right to fill all vacancies in the board, and with this prevision unimpaired, and remaining

SAGE, &c.
vs.
DILLARD, &c.

in full force, the Legislature passed an act appointing sixteen additional trustees, after having granted the right to do this to the old board. If they could do this, it is not perceived how they could be restrained in the exercise of any corporate franchise they had granted. They could disfranchise or remove from office any of the officers of the institution. A similar question to this arose in the case of *Allen vs. McKean,* 1 *Sumner,* 277, where the same view seems to have been taken by the court; but the case did not turn wholly on this question—the act being adjudged unconstitutional on other grounds.

But the contract was made with the original trustees, and such as they might elect. The right to alter or amend this contract, does not include the right of making new parties to the contract. The reserved power to alter or amend the contract, was to alter or amend the contract between the same parties. In the case of *St. Mary's Church,* 7 *S. and R.,* 562, Mr. Justice Duncan says: "My opinion is, that the proposed amendment, striking out an integral part of the corporators, and substituting another class of men in their stead, is not a lawful amendment; is not an amendment at all, but a grant of a new corporation." In this case, the power of amendment was expressly reserved. So in the case of *Allen vs. McKean,* before cited. In commenting on the reserved power to "alter, limit, annul, or restrain any of the powers by this act vested," Mr. Justice Story says: "The language of the section is certainly very broad, but it is not unlimited." He continues: "The founder has the right to have the statutes of his foundation, as to the power of the trustees, strictly adhered to, except so far as he has consented to an alteration of them. But an authority to alter or modify these powers can never be fairly construed into an authority to take them away from his trustees, and confer the same powers upon other persons." It does not authorize the Legislature to *assume to itself the powers of the trustees, or to appoint*

*new trustees ;* for that would affect the rights and interest of the founder, who has the right to select his own administrators of his own bounty in perpetuity. I do not say that the Legislature might not have authorised an increase of the number of trustees, leaving the appointment to be made by the existing board, if that would leave the funds still to be administered by agents selected by the proper visitors of the founder." (*page* 305.)

SAGE, &c.
*vs.*
DILLARD, &c.

The addition of new trustees, according to the foregoing authorities, is not an amendment of an existing charter ; it is in effect making a new charter —proposing a new contract with new parties. It does not, it is true, take away the franchise from the old trustees, but it vests the same franchise in additional trustees, in a way to render of no value the existing franchise. A sufficient number is appointed to overrule the action of the old trustees, and thus the control is virtually given to trustees not appointed according to the charter. It is in effect the same thing as taking the property from one set of trustees, designated by the founders, and conferring it on other persons. (See *Trustees of Aberdeen Academy vs. Mayor and Aldermen of Aberdeen,* 3 *Smeades & Marshall,* 347.)

If the corporation, in the hands of the trustees, had become in any way inimical to the public good, the power was reserved to repeal the charter. The property would then go according to the established rules of law. But while the corporation remains, the power to alter or amend the charter must be construed, as limited in its operation to the persons with whom the contract is made. Upon every view which we have been enabled to take of this question, we think it clear that the act of the Legislature in appointing the sixteen trustees was unconstutional and void; a violation of the obligation of the contract between the parties, and that the new trustees are not rightfully and legally trustees of the corporation.

SAGE, &c.
vs.
DILLARD, &c.

*James Harlan, J. W. Stevenson, and J. T. Morehead,* for appellees—

The authorities show that when a power is reserved in a charter to amend, alter, or modify it, the power may be exercised by any subsequent legislature, and it cannot be controverted by the corporation. (*Angel and Ames on Corp.* 652; *Wales vs. Stetson*, 2 *Mass. Rep.* 146; *Dartmouth College vs. Woodward*, 4 *Wheat.* 708, per Story, Justice; 7 *Conn. Rep.* 53; 2 *Kent's Com.* 306; 11 *Peters*, 443–4; *Ib.* 561; *Providence Bank vs. Billings.*)

The sixteen trustees, when appointed, became so, *ipso facto*, and had the right to exercise all the rights and privileges pertaining to that station, and the actings and doings of the eighteen trustees were legal and proper.

Sage had no right to excuse himself from his failure to deliver the papers, by saying that he had delivered them to Mr. Lee, the chairman. He delivered them in his own wrong, and the Circuit Court decided correctly on that point.

The case referred to by the opposing counsel, as having occurred in Cromwell's time, is not applicable to the present case, because the report does not show that the dissenters were a majority. The inference is that they were a minority.

The argument that the Legislature might appoint trustees who might misappropriate the funds to other than educational purposes, has no force in it, because that would be a direct violation of the original act of incorporation, and it is not to be presumed that it would be done. There is no pretence that the trustees appointed by the act of 1848, have or intend to appropriate the funds to any other purpose than originally intended. If any such abuse were committed, then a different question would arise.

It is contended that the amendment of 1848, was not binding unless accepted by the corporation. If that were so, then the privilege reserved by the Legislature, would be of little avail, because the

corporation could in effect control the Legislature. It is no argument to say that the Legislature may act unwisely. The corporation were willing to risk the action of future Legislatures. They were not bound to accept the charter. The Legislature did not ask them to do it. By having accepted the charter, they took it subject to all the consequences.

The question is brought to this point: Whether the act of the Legislature of 1848 was a legitimate exercise of power? That it was, the authorities referred to abundantly show. There is no qualification in the reservation clause. It is full and comprehensive, and no more power has been exercised in naming trustees than was exercised in the original act. The amendment does not strike at the existence of the corporation, nor, so far as appears from the record, impair its usefulness. It is not intimated that the gentlemen named, are not, in every sense of the term, well qualified to act as trustees.

The construction given to the reservation clause, by the counsel of Sage, is not warranted. If any such exceptions were intended, they would have been inserted in the form of a proviso. The right to appoint additional trustees was not surrendered by the Legislature, and it will be time enough to controvert that right when there is some evidence of a disposition to abuse it.

It is a well settled principle of adjudication that the court will not declare an act of the Legislature to be unconstitutional, unless it be *palpably* so. The attack on the act of 1848, is a farfetched and strained construction; not within the spirit and intention of the parties at the time of its passage. It seems to us, that the decree should be affirmed.

Judge CRENSHAW delivered the opinion of the Court—          January 18.

A convention, called the Western Baptist Convention, met in Cincinnati, in the year 1833, at which time they took into consideration, the establishment of a Baptist Theological Institution, in the valley of

the Mississippi. The subject was referred to a committee, who were to make their report to the convention, at their meeting the next year. The committee accordingly reported in the year 1834, recommending the establishment of such an institution; and their report was adopted. Thereupon, a society was formed, denominated, The Western Baptist Education Society. The executive committee of this society purchased lands adjoining the city of Covington, for the purpose, and with the view to the establishment thereon of the contemplated Theological Institution.

In the year 1840, application was made to the Legislature of Kentucky, and a charter was obtained, incorporating the Western Baptist Theological Institute, at or near Covington. The first section of the act reads thus:

"That Cave Johnson, Henry Wingate, E. Robbins, J. L. Holman, S. W. Lynd, John Stephens, and Thatcher Lewis, who have united themselves together for the purpose of promoting education in the Baptist denomination in the Western States, and their successors, be, and they are hereby, created a body corporate and politic, with perpetual succession, to be styled The Trustees of the Western Baptist Theological Institute, with full power to acquire, hold, and transfer property, real and personal, make contracts, sue and be sued, plead and be impleaded in their corporate capacity, to make, have, and use a common seal, and the same to break, change, and alter, at pleasure."

By other sections of the charter, it is declared that the money, funds, and estate which then belonged to said Institute, or which might thereafter be acquired by it, should be vested in said trustees, to be held by them in their corporate capacity, for the sole use and benefit of the Institute, for the purpose of promoting learning therein; that the trustees and their successors should have power to appoint a chairman out of their own number, to preside over them in their de-

liberations relative to the business of the Institute, and should have power to fill all vacancies that might occur in the body; that they should have power to appoint a president, and such professors of the various departments of learning to be taught in the Institute, as they might think proper, and to appoint all such other officers, as they might deem necessary for the management of the concerns of the Institute, and remove the same at pleasure, and also fix the compensation which they should receive for their services; that they should have power to make all such by-laws, rules and regulations, for the government of the Institute, and the management of its concerns, as they might deem expedient, and to alter, annul, and amend the same at pleasure, provided that the by-laws, rules, and regulations should not be repugnant to the laws of the Commonwealth, nor inconsistent with the principles of the charter; and the last section declares that any future Legislature might alter, amend, or repeal the act, whenever they might deem it right and proper to do so.

After the passage of this act of incorporation, the executive committee of the Western Baptist Education Society, conveyed said lands, purchased by them for the purposes above mentioned, to the said trustees of the Western Baptist Theological Institute, for the purpose of promoting learning in the same. In 1841, an amendatory act was passed, authorizing the board of trustees to increase their number to thirteen, whenever, in their judgment, it might be expedient, and to appoint a secretary, &c. In 1845, another amendatory act was passed, authorizing the board of trustees to increase their body, to any number not exceeding thirty-six, &c.

To these amendatory acts, the board of trustees appear to have had no objection, but received and approved the same. But, in January, 1848, the Legislature passed another amendatory act, increasing the number of trustees to sixteen above the number then in office, and appointed, by name, the per-

1. An act of the Legislature incorporated the Western Baptist Theological Institute, in 1840, with seven trustees, by name, reserving the

SAGE, &c.
vs.
DILLARD, &c.

power to amend
the charter. In
1841, an act was
passed author-
izing the trus-
tees to increase
their number to
thirteen, which
amendment was
accepted. In
1845 another
amendment to
the charter was
passed, author-
izing the trus-
tees to increase
their number to
thirty-six, which
was also accept-
ed. In 1848 a
third amend-
ment was pass-
ed appointing
sixteen addi-
tional trustees
to the number
then in office
(which was 21,)
which amend-
ment a majori-
ty of the seven-
teen then in of-
fice met and re-
fused to accept,
or permit the
sixteen to act
with them as
trustees, and ad-
journed. A mi-
nority of the
seventeen, and
the sixteen ap-
pointed by the
act of 1848, or-
ganized them-
selves into a
board, and
claimed the con-
trol of the In-
stitute. Held—
that the Legis-
lature had no
power to add to
the number of
the trustees
without their
consent, and
that the newly
appointed trus-

sons who should compose the sixteen additional members of the board; and declared that, in all future appointments of trustees under the charter, the persons appointed should be citizens of Kentucky; that no appointment should be made except at a regular meeting of the board, when a majority of all the trustees should be present, concurring in the appointment, &c.

The next meeting of the board of trustees, succeeding the passage of this latter amendment, was held on the 20th of March, 1848, there being then twenty-one old trustees in office, and seventeen present at the meeting. The latter act of the Legislature was presented to them, and they determined not to accept it; and refused to admit or recognize the sixteen additional men appointed by the Legislature as trustees, to be such—some of whom presented themselves, and claimed seats in the board. A majority of the old trustees, after refusing to accept the act of 1848, and after declining to acknowledge the sixteen claimants to be trustees, and refusing to admit them to seats as such, adjourned; and, immediately, a minority of the old trustees, and a part of the new appointees, organized themselves into a board, appointing a chairman *pro tem;* and proceeded to abolish the office of general agent, then held by O. N. Sage, and ordered that he should deliver up to them the books, papers, &c., which were in his custody.

Lee, who was chairman of the regular board of trustees, on the 20th of March, 1848, when the new appointees claimed their seats, says, in his deposition that, on that day or the day after, apprehending, from the clamorous behavior of the new trustees appointed by the Legislature, violence, and perhaps a mob, against the Institute, he directed Sage, the general agent of the board of trustees, to deliver over to him the books and papers pertaining to the Institute, which he did.

Sage, not having complied with the order of the new board, directing him to deliver over to them the books and papers of the Institute, a minority of the old trustees, and a part of the new ones, brought this suit against Sage, and the majority of the regular board of trustees, praying that Sage be required to deliver up to the order of the complainants the papers, bonds, notes, choses in action, and evidences of debt, belonging to the Institute. The Circuit Court rendered a decree granting the prayer of the bill, and from that decree this writ of error is prosecuted.

.The only question presented for our consideration, important to be considered, is, had the Legislature power to pass the amendatory act of 1848, by which they created, and appointed by name, sixteen additional trustees to the number then in office? When this act was passed, the Legislature did not take away the previously granted power to the old trustees to increase their body to any number not exceeding thirty-six. Had additional trustees been really necessary to the healthful and prosperous and vigorous operation of the affairs of the Institute, the trustees, then in office, were vested with full power to supply the necessity, by an appointment of the requisite number. And their situation as visitors and superintendents of the Institute, certainly gave them the best means of judging as to the propriety of increasing the number of their body. They, though in the most favorable situation for determining this question, had not, it seems, perceived the necessity or propriety of adding to their number. Satisfied with the management of the Institute, and of its healthful and salutary operations, under their supervision and care, having ample power to increase their number at any time, they did not perceive the necessity or propriety of applying to the Legislature to do what they had full and complete power to accomplish. They did not, therefore, apply for, nor obtain, the passage of the act of 1848. The

SAGE, &c.
vs.
DILLARD, &c.

tees and a minority of those in office had no right to assume the control of the institution.

2. A reservation by the Legislature in a charter to alter, repeal, or amend, does not imply the power to alter or change the vested rights acquired by the corporators under the charter, and to add new parties and managers without the consent of the corporators.

Sage, &c.
vs.
Dillard, &c.

Legislature must have been petitioned upon this subject from some other quarter. It may be, that a minority of the old board saw proper, either alone or in conjunction with others, to procure from the Legislature this enactment. But, the act of a minority, unauthorized by the board either by resolution or order, at any of their meetings, or otherwise, could not be, in any point of view, at all obligatory upon the board, and they declined to recognize the validity of a law involving the exercise of ministerial functions of the Institute, procured against their consent, and contrary to their will. The board of trustees not only gave no authority for the application, but refused to recognize the act of the Legislature as obligatory upon them—the enactment, as they conceived, interfering with privileges previously granted to themselves. And the question is—had the Legislature power—under the reserved right in the original charter, to alter, amend, or repeal, the act incorporating the trustees—to assume to themselves, against the will and consent of the board of trustees, the very privilege which they had granted to the trustees. There can be no doubt that, without the reservation contained in the original act, the Legislature would have no right to make such an enactment without the consent of the trustees. The contrary is not urged in argument. The corporation is a private, not a public one. The charter is a contract between the government and the trustees who were thereby incorporated. By this contract certain rights and immunities were vested in, and conferred upon the trustees who were incorporated, and the Legislature had no right or power to change these rights and immunities, or to impair them, against the will and consent of the corporators, except so far as they had reserved the right to do so. If the act of the Legislature does not come within, but is contrary to, the spirit and meaning of the reservation, it impairs the obligation of the contract, and

it becomes our unpleasant duty to declare the act unconstitutional and void.

Then, did the Legislature which granted the charter, or the trustees who were incorporated, and to whom the grant was made, contemplate, that any future Legislature would have the power, under the right reserved, to assume to themselves the right of creating additional corporators, or adding new parties to the contract without the consent of those with whom the original contract was made? Does the right to "alter, amend, or destroy" a contract, include the right to add other parties, and invest them with the *same* priviliges and franchises conferred upon the original parties? The power to alter or amend a contract, in our conception, is to change it as between the original parties, and such others only, as háve been permitted, by their mutual consent, to come into the enjoyment of its benefits and privileges; not to compel one of the parties to operate in conjunction with others, and share with them the privileges and benefits of the contract. When such a power is attempted to be exercised by one of the parties over the other, has not the party upon whom the attempt is made, a right to say: "Alter, or amend, or even destroy, the contract subsisting between *us*, but do not, under the semblance of an alteration or amendment, force us to co-operate with men, (it may be,) between whom and ourselves, there cannot be peace, harmony, and concert of action." It is easily seen, that the great enterprise in which the corporators embarked—that of educating the Baptist ministry in the valley of the Mississippi—might thus be thwarted, and the whole scheme weakened and crippled in its energies. Surely no such alteration or amendment as that made in 1848, was contemplated by the parties to this charter or contract, under the reservation contained in the original act. Can it, indeed, be properly denominated an amendment at all? Is it not rather a new contract? Duncan, Justice, in the case of St. Mary's Church, 7th, *S.*

SAGE, &c.
*vs.*
DILLARD, &c.

SAGE, &c.
vs.
DILLARD, &c.

& R. 562, used this language: "My opinion is, that the proposed amendment, striking out an integral part of the corporation, and substituting another class of men in their stead, is not a lawful amendment—*is not an amendment at all*, but the grant of a new corporation, and a new charter." Again he says, on page 564: "The charter is a contract between the State, the founder, and the objects of the charity, all of whom are bound by its terms. The contract on the part of the government is, that the property, with which the charity is endowed, shall be vested in a certain number of persons, and their successors, designated by the founder, to subserve the purposes of the founder, and to be managed in a particular way. But, if the alteration changes the character of the trustees, then they are not the same persons, the grantors intended should be the managers. The same identical franchise that has been before granted to *one*, cannot be bestowed on *another*, for this would prejudice the former grant." In this case, it appears that the original founders, or endowers of the Institute, were willing to entrust their charity to the care and management of the original trustees, and such others, of course, as might be necessary, in their opinion, to effectuate the objects of the charity. To trustees of their own selection, they confided the bounty which they bestowed for a great, a praiseworthy, and a noble purpose. In the hands of these men, and others of *their* choice, they entrusted the management and control of an institution which, by their munificence, was brought into being, and into which their beneficence has infused energy and usefulness. This charity has grown into a valuable estate, and sustains an institution which was designed to promote education in the Christian Scriptures, and qualify a Baptist ministry to disseminate religious knowledge in the West. The object is a laudable one, and can it be, that the Legislature, in retaining the right to "alter" or "amend" the charter, retained the right to take the supervision and control

SAGE, &c.
vs.
DILLARD, &c.

of this opulent charity out of the hands of those to whose care and oversight, the founders confided it, and place it in the hands of strangers, who never breathed, perhaps, a single breath of vitality into this Institution, either to impart to it life or growth? We think not. The new trustees are, no doubt, honorable and worthy and high-minded gentlemen —the Legislature would not have conferred trusts, so momentous and important, on any other description of men. But, however honorable and worthy ⸴ they may be, they are not the men selected by the founders, nor by those who were incorporated at their instance, to carry out the great purposes they had in view, in the establishment of the Institute.

The number of new trustees, when added to the minority of the old ones, constitute a majority; and, if the old trustees are compelled to acknowledge the new ones, as composing a part of the board, their power in the management and control of the Institute is completely frustrated. However opposite the views of the new trustees may be to the views of the old ones, in regard to the means proper to be employed to advance the interests and prosperity of the Institute, the old trustees must yield their opinions and judgment to the new, and suffer their energies in behalf of the establishment to be smothered and paralyzed, by the force of superior numbers. If the old trustees had been displaced by the act of the Legislature, and the new ones appointed in their place, the change, for every substantial, practical effect, would not have been more radical. The new trustees could not then have done more than they *willed* to do, and, by their union with the minority of the board, they are enabled to accomplish whatever they may *will* to accomplish. The withdrawal, by the Legislature, of all the privileges conferred upon the old trustees, and their actual displacement, and the creation of an entirely new body, would not more effectually have prostrated their powers, than the making of a sufficient number of new trustees, who, when added

Sage, &c.
*vs.*
Dillard, &c.

to the minority of the former board, constitute a sufficient number to carry all their views and purposes, in defiance of the views and purposes of the regular board. They are not only enabled by force of numbers to achieve any object pertaining to the management of the Institute, but actually to vote themselves into the possession of all its effects, books and papers. They have already entered an order upon the general agent, directing him to deliver up the papers, choses in action, &c., of the Institute, and have brought this suit to enforce that order. And, if the arm of the court be raised in aid of their purposes, the result will be that the property and effects of the founders of the institute, against their will and consent, will be transferred to the hands of strangers, to be by them disposed of, managed, and controlled, in despite of the wishes of the founders, or their trustees. Can this be done ? Can a court legitimately extend its arm to the accomplishment of such a purpose ? We say not. *Cujus est dare, ejus est disponere.*

In our opinion, the act of the Legislature, creating sixteen new trustees, without the consent of the board, is not an act coming within the scope and meaning of the powers reserved in the act. As it seems to us, the passage of this act was not so much the exercise of a legislative function, as it was the exercise of the ministerial functions, pertaining peculiarly to the board of trustees. It is an act not changing or amending the mode or manner in which the trustees to whom had been given, by the founders of the charity, the supervision and visitorial power of the Institute, but it is an act by which this supervision and visitorial power is substantially taken away and conferred upon others. True, the Legislature may, by virtue of the reservation, repeal or destroy ; but the power to destroy does not imply a right to cripple or to maim.

It is said that in the case of *Allen vs. McKean,* 1 *Sumner,* 277, which involved a question similar to the one under consideration, Justice Story, in comment-

ing upon the reserved power of the Legislature to limit, annul or restrain the powers vested by the act, uses the following language : "The language of that section is certainly very broad, but it is not unlimited. The founder has a right to have the statutes of his foundation, as to the power of the trustees, strictly adhered to, except so far as he has consented to any alteration of them. But an authority to alter or modify these powers, can never be fairly construed into an authority to take them away from *his* trustees, and confer the same powers on other persons." And such is our own conclusion in this case.

The reservation of the right to alter, amend, or repeal the act by which this corporation was created, is certainly prudent and salutary; but it seems to be a necessary implication, that if the Legislature should undertake to make what, in their opinion, is a legitimate alteration or amendment, the trustees have the power to accept or reject it, whatever may be the consequences. If, from mal-administration, or otherwise, the Legislature should, at any time, deem it expedient to put the Institute out of existence, by a repeal of its charter, they have the unquestionable power to do so; but they have, in our opinion, no right or power to compel the trustees to *accept* any act which they may pass, although, in their estimation it may comport with the power reserved. Indeed, we perceive but little if any utility in a reservation of power to alter or amend, when it strikes us as axiomatic, that the Legislature can impose no alteration or amendment upon the trustees without their consent, either with or without the reservation. The Legislature can no more force the trustees to *accept* an alteration or amendment of their charter, than they could have forced them to *accept* the original charter. Under the reservation, they can repeal or destroy, without any consent on the part of the trustees, but as long as they remain in existence as a corporate body, they necessarily have the power to reject an amendment. What might be the consequences of

the rejection of a lawful amendment, it is unnecsary for us to consider.

We deeply regret this unhappy controversy among gentlemen who, doubtless, are equally anxious to promote the best interests of the Christian religion in the West, and who, but for the unfortunate differences existing between them, might see their efforts crowned by an institution which would shed lustre upon their names, and be a perpetual monument to their united and noble exertions in the best of causes —that cause which condemns all strife, and enjoins fraternal feelings, good will, peace, harmony and love.

Decree reversed, and the cause remanded with directions that the bill be dismissed.